558 S.E.2d 663

**Jane DOE, Plaintiff Below, Appellant,**

v.

**WAL–MART STORES, INC., A Corporation; B.C. Associates Limited Partnership, a Limited Partnership; and Robert Belcher, Defendants Below, Appellees.**

**Jane Doe, Plaintiff Below, Appellant,**

v.

**Wal–Mart Stores, Inc., A Corporation, Defendant Below, Appellee.**

**Nos. 26012, 29335.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2001.

Decided Dec. 7, 2001.

Concurring opinion of Justice Starcher Dec. 13, 2001.

Richard E. Rowe, Suzanne Jett Trowbridge, Goodwin & Goodwin, Charleston, for appellant.

James D. McQueen, Lynnette S. Simon, McQueen, Harmon & Murphy, Charleston, for appellee, Wal–Mart Stores, Inc.

DAVIS, Justice:

Jane Doe, appellant/plaintiff below (hereinafter referred to as "Ms. Doe"), appeals an adverse jury verdict from the Circuit Court of Raleigh County.[1] Ms. Doe has assigned error to rulings by the trial court that involve: (1) the failure to disqualify a potential juror for cause; (2) erroneous jury instructions; (3) the empty chair closing argument;

---

1. This appeal is a consolidation of two appeals filed by Ms. Doe.

(4) the limitation of discovery; (5) the exclusion of expert testimony; (6) the exclusion of an article by David Gorman; and (7) posttrial sanctions. After considering the briefs, reviewing the record and listening to the arguments of the parties, we reverse the jury verdict in this case and grant a new trial.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On February 23, 1994, Ms. Doe was abducted from the Beckley Crossings Shopping Center in Raleigh County, West Virginia by Billy Jo Hampton (hereinafter referred to as "Mr. Hampton"). At the time of the abduction, Mr. Hampton was being pursued by Virginia law enforcement officials for attempted murder. Mr. Hampton forced Ms. Doe into her car. He then drove the car to a remote area of Summers County where he sexually assaulted Ms. Doe. After the sexual assault, Mr. Hampton fled. Mr. Hampton left Ms. Doe alive at the crime scene.[2]

Thereafter, on February 1, 1995, Ms. Doe filed the instant action against Wal–Mart Stores, Inc., appellee/defendant below (hereinafter referred to as "Wal–Mart").[3] The complaint charged Wal–Mart with breaching the duty to provide adequate security at the parking facility where Ms. Doe was abducted. On September 1, 1995, the circuit court entered an order dismissing the complaint for failure to state a cause of action upon which relief could be granted. Ms. Doe filed an appeal to this Court challenging the dismissal. We reversed the dismissal and remanded the case for trial in *Doe v. Wal–Mart Stores, Inc.,* 198 W.Va. 100, 479 S.E.2d 610 (1996).

On remand, the case proceeded to trial. The jury returned a verdict in favor of Wal–Mart. Ms. Doe timely appealed the verdict. While the appeal was pending before this Court, Ms. Doe moved to remand the case

for posttrial discovery. In her remand request, Ms. Doe alleged pretrial discovery abuses by Wal–Mart. By order entered June 3, 1999, this Court granted the motion for remand to conduct posttrial discovery.

As a result of this Court's remand, the trial court granted Ms. Doe ninety days to conduct posttrial discovery. At the end of the discovery period, the parties presented to the trial court three motions. Ms. Doe moved the court for an extension of time to conduct further discovery which motion the trial court denied. Then, Wal–Mart presented two motions: a motion for partial summary judgment as to the admissibility of a previously undisclosed study and a motion for a protective order preventing discovery of information pertaining to sanctions against Wal–Mart in other jurisdictions. The trial court granted both of Wal–Mart's motions.

As a result of these rulings, Ms. Doe also appealed the trial court's posttrial discovery rulings. Therefore, for appeal purposes, this Court consolidated the original appeal of the adverse jury verdict with the appeal concerning the trial court's three posttrial discovery rulings.

## II.

## STANDARD OF REVIEW

When reviewing a trial court's rulings, we typically employ a three-part standard of review.

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167

---

**2.** Mr. Hampton was later apprehended in North Carolina.

**3.** The lawsuit also named as defendants Mr. Robert Belcher and B.C. Associates Limited Partnership. The action against B.C. Associates was settled prior to trial, and B.C. Associates is not a

party in this appeal. Mr. Robert Belcher, the manager of the Beckley Crossings Wal–Mart store, was apparently named as a nominal party. In this appeal, however, Ms. Doe's brief refers only to Wal–Mart, and no separate issues have been raised relating to Mr. Belcher.

(1997). Given the diversity of Ms. Doe's assignments of error, however, additional standards of review pertaining to specific issues are also applicable to this proceeding. Therefore, where such additional standards are pertinent, we will incorporate such methods of review into our discussion of the corresponding assigned errors.

## III.

## DISCUSSION

### A. Disqualification of Potential Juror for Cause

Ms. Doe first asserts that the trial court committed error in failing to strike a potential juror for cause. She claims that during voir dire of the jury panel, she learned that one juror, Tammy Rae Hylton, and her husband owned stock in Wal–Mart. During voir dire, Ms. Doe further discovered that Ms. Hylton's husband was employed as a produce manager by Wal–Mart in one of its Virginia stores. Ms. Doe moved the trial court to strike Ms. Hylton for cause. However, the trial court denied the motion after Ms. Hylton stated during individual voir dire that she could fairly and impartially decide the issues in the case based upon the evidence. Therefore, Ms. Doe used one of her two peremptory strikes to remove Ms. Hylton from the jury.

■■■ In reviewing such matters, we have held that "[t]he decision to grant a motion to strike a juror for cause is within the sound discretion of the trial court." *Wheeler v. Murphy*, 192 W.Va. 325, 331, 452 S.E.2d 416, 422 (1994). The appropriate standard of review was fully outlined in *State v. Miller*, 197 W.Va. 588, 600–01, 476 S.E.2d 535, 547–48 (1996), as follows:

> In reviewing the qualifications of a jury to serve in a criminal [or civil] case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the

reasonableness of the procedure employed and the ruling on disqualification by the trial court.

A trial court's determination as to whether to strike a juror for cause will be "reverse[d] only where actual prejudice is demonstrated." *Miller*, 197 W.Va. at 605, 476 S.E.2d at 552 (citation omitted).

■■■ In Syllabus point 7 of *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982), this Court indicated that "[t]he true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court." We have also cautioned "that the mere statement of a prospective juror that he or she is not biased with respect to a particular cause may not be sufficient for the trial court to conclude that no such bias exists." *West Virginia Dep't. of Highways v. Fisher*, 170 W.Va. 7, 11, 289 S.E.2d 213, 218 (1982). We believe that the fact that the juror owned stock in Wal–Mart and that her husband was employed by Wal–Mart constituted grounds for *per se* disqualification of the juror.

Under the common law there were several grounds for which a person was per se disqualified from serving on a jury. Those grounds were:

> (1) Kinship to either party within the ninth degree; (2) was arbitrator on either side; (3) *that he has an interest in the cause;* (4) that there is an action pending between him and the party; (5) that he has taken money for his verdict; (6) that he was formerly a juror in the same case; (7) that he is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him; and causes of the same class or founded upon the same reason should be included.

*State v. Riley*, 151 W.Va. 364, 383, 151 S.E.2d 308, 320 (1966) (internal quotation marks omitted) (emphasis added)[4]. Grounds for disqualification from serving on a jury are also contained in W.Va.Code § 56–6–12 (1923) (Repl. Vol. 1997) as follow:

---

**4.** "Under our law, the eligibility and qualifications of jurors in both civil and criminal cases are controlled by several statutes and by our

adoption of the common law grounds for disqualification[.]" *State v. Beckett*, 172 W.Va. 817, 820, 310 S.E.2d 883, 887 (1983).

Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or *has any interest in the cause*, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily.

(Emphasis added).

As illustrated above, under the common law and by statute, a person is disqualified from sitting on a jury in a case in which he or she has an interest in the outcome. Therefore, we hold that pursuant to West Virginia statutory and common law, a person is disqualified from sitting on a jury in a case in which he/she has an interest in the outcome of the litigation. Therefore, if, during jury selection, it becomes apparent that a potential juror has such an interest, the trial court must strike the juror for cause. Failure to so strike an interested potential juror constitutes reversible error. *See Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971 (4th Cir.1971) ("That a stockholder in a company which is party to an action is incompetent to sit as a juror is so well settled as to be black letter law."); *In re Asbestos Litig.*, 626 A.2d 330, 332 (Del.Super.Ct.1993) ("[T]his Court holds that all jurors who own any amount of stock in any party to an action must be removed from the panel for cause."); *Thompson v. Sawnee Elec. Membership Corp.*, 157 Ga.App. 561, 278 S.E.2d 143, 145 (1981) ("[W]e conclude that the members of an electric membership corporation are disqualified from service as jurors in the trial of a case in which damages are sought from the corporation."); *Alston v. Black River Elec.*

*Coop.*, 345 S.C. 323, 548 S.E.2d 858, 862 (2001) ("[W]e hold that when a cooperative is a party to a lawsuit, a cooperative member has an inherent pecuniary interest in the case. Thus, the bias of a cooperative member shall be presumed—just as a corporate stockholder's is when the corporation is a party.").

In the instant proceeding, the juror owned stock in Wal–Mart and her husband was employed by defendant Wal–Mart.[5] Clearly, whether expressed or not, the juror had an interest in the case and should have been removed for cause. The fact that Ms. Doe eventually struck the juror is of no consequence. Ms. Doe was entitled to exercise her peremptory strikes from a jury panel consisting of qualified, impartial and unbiased jurors. *See Davis v. Wang*, 184 W.Va. 222, 226 n. 7, 400 S.E.2d 230, 234 n. 7 (1990) ("[T]he fact that the jurors in question were eventually removed from the jury panel by the use of peremptory strikes is not relevant to the decision."). Thus, we conclude that she is entitled to a new trial. Although we have found that a new trial is warranted, we must nevertheless address other assignments of error that could impact on the new trial.

### B. Erroneous Jury Instructions

Ms. Doe also assigns error to certain jury instructions which were given. She also claims that it was erroneous for the trial court to refuse certain proffered jury instructions. This Court addressed the standard of review for jury instructions in Syllabus point 6 of *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995), as follows:

The formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.

5. Whether a de minimis ownership of stock in a corporation constitutes "any interest in the cause" may require an inquiry by the trial court, into whether or not a juror should be disqualified.

We have also held that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. pt. 1, in part, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996). "Of course, our review of the legal propriety of the trial court's instructions is *de novo.*" *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996) (citation omitted). In Syllabus point 4 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we observed:

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Within the confines of these principles, we shall examine each jury instruction issue presented by Ms. Doe.

6. Defendant's Instruction No. 14 read as follows: The plaintiff must establish by a preponderance of the evidence that Wal–Mart owed her a duty and that it breached the duty owed. Wal–Mart's duty, if any, as to the common areas is defined by the terms of the Lease Agreement between Wal–Mart and B.C. Associates. Therefore, if you find that the Lease Agreement does not require Wal–Mart to provide security for the Beckley Crossings parking lot or to take any other action to prohibit criminal activity then you may find in favor of Wal–Mart.

7. Although Ms. Doe waived any objections to Instruction No. 14 as amended, we concluded that the instruction is not an accurate statement of the law in West Virginia and should not be given on retrial. This Court has previously noted that "in cases dealing with premises liability we have generally adhered to the principle that liability results either from control of the subject area or from a specific wrongful act." *Durm v. Heck's, Inc.*, 184 W.Va. 562, 565, 401 S.E.2d 908, 911 (1991) (citations omitted). Under *Durm* the express language in a lease setting forth who has

*1. Defendant's Instruction No. 14.* Ms. Doe argues that Instruction No. 14 submitted by Wal–Mart, was an incorrect statement of the law.[6] To support the instruction, Wal–Mart contends that any infirmity with the instruction was waived because Ms. Doe failed to object to the instruction. Rule 51 of the West Virginia Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the refusal to give an instruction unless the party objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which the party objects and the grounds of the party's objection[.]" *See* Syl. pt. 5, *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996).

Based upon our review of the record, we conclude that Ms. Doe objected to Instruction No. 14 as originally submitted. However, the trial court amended the instruction to conform to the objection. Thereafter, Ms. Doe did not object to the amended instruction. "A litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal." Syl. pt. 1, *Maples v. West Virginia Dep't. of Commerce*, 197 W.Va. 318, 475 S.E.2d 410 (1996).[7] We therefore conclude that Ms. Doe waived any objections to the instruction.[8]

control of a common area will generally be the source for who is liable. However, the absence of an express assignment of such control does not automatically immunize the lessee from liability.

8. Ms. Doe also assigned error to Defendant's Instruction No. 20. Wal–Mart correctly points out that this instruction, as amended by the trial court, was likewise not objected to by Ms. Doe. We therefore find that this issue was also waived. However, for purposes of retrial, we note that Instruction No. 20, as amended, is a correct statement of the law. That instruction read:

> If you find that Wal–Mart, as lessee of the store building, did not assert control over the parking lot, had no duty under the lease to maintain the parking lot or to take any other action to prohibit criminal activity in the Beckley Crossings parking lot, you may find in favor of Wal–Mart.

For further discussion of a lessee's responsibility vis-a-vis common areas, *See* note 7.

**2. Plaintiff's Instruction No. 8.**

Ms. Doe additionally argues that the trial court committed error in refusing her Instruction No. 8.[9] Wal–Mart, in an indirect way, contends that even if the instruction was proper, the error in refusing this instruction was not reversible error. In support of its argument, Wal–Mart relies upon language in Syllabus point 11 of *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994), wherein we indicated that "[a] trial court's refusal to give a requested instruction is reversible error only if ... it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense."

Instruction No. 8 was a correct statement of the law. The instruction tracks the language of Syllabus point 3 of *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992)

Where the operator of a business obtains the right for its customers to park in an adjoining lot owned by another and invites them to do so, the operator has a duty of reasonable care to protect its invitees from defective or dangerous conditions existing in the parking area which the operator knows or reasonably should know exist.

Therefore, if Instruction No. 8 is proffered again during the new trial, it should be given.

### C. The Empty Chair Closing Argument

Ms. Doe's next assignment of error concerns the trial court's denial of her motion to preclude Wal–Mart from presenting a closing argument which blamed B.C. Associates for the incident.[10] In Syllabus point 2, in part, of *Groves v. Compton,* 167 W.Va. 873, 280 S.E.2d 708 (1981), we held that "[i]n the absence of a written stipulation by the parties, the better rule is to leave the question of the manner of ... informing the jury that [a] party has been dismissed from the lawsuit ... to the sound discretion of the trial court." We also noted in *Groves* "that it is improper for counsel to argue to the jury why a party has not been brought into the lawsuit or that an absent party is solely responsible for the accident since the evidence surrounding such absent party's liability has not been fully developed." *Groves,* 167 W.Va. at 879, 280 S.E.2d at 712.

The record reveals that Wal–Mart properly interjected comments during trial regarding the lease between B.C. Associates and Wal–Mart. However, Wal–Mart violated the mandate of Syllabus point 2 of *Groves* when it made the following argument to the jury:

Counsel for Wal–Mart: ... [W]hy is Wal–Mart the party to this lawsuit? Why isn't it Cato, why isn't it—where is B.C. Associates, why isn't it B.C. Associates?

This argument allows for inappropriate speculation by the jury regarding B.C. Associates' role in the case. *Groves* specifically prohibits Wal–Mart from making such an argument. We therefore find that the trial court erred by not limiting Wal–Mart's references concerning B.C. Associates.[11] While

---

9. Plaintiff's Instruction No. 8 read as follows:

If the defendant Wal–Mart knew or had reason to know, that its patrons regularly used the parking lot in connection with its business, then Wal–Mart owed the plaintiff Ms. Doe a duty of reasonable care for her protection as to hazards of which it was aware or by the exercise of ordinary diligence should have been aware.

Therefore, if you find by a preponderance of the evidence that the defendant Wal–Mart knew or had reason to know that its customers were subject to an attack by a criminal in its parking lot and failed to take steps as would likely deter the possible criminal attacks, or that the steps taken by it were negligent, than you may return a verdict for Ms. Doe against Wal–Mart as you are hereinafter instructed.

10. B.C. Associates settled with Ms. Doe prior to trial.

11. Wal–Mart contends that Ms. Doe's failure to make an objection during closing argument precludes our consideration of the empty chair argument. We disagree. Ms. Doe did not have to object during closing arguments because the trial court denied her motion in limine on this exact issue. *See* Syl. pt. 1, *Wimer v. Hinkle,* 180 W.Va. 660, 379 S.E.2d 383 (1989) ("An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence."). As we held in Syllabus point 4, in part, of *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995),

we find this issue constituted error, we need not determine whether such error, standing alone, is sufficient to warrant a new trial because we have determined that a new trial is necessitated on other grounds.

## D. Discovery Limitation

Ms. Doe additionally contends that the trial court committed error by limiting her discovery request pertaining to similar criminal assaults at other Wal–Mart stores throughout the nation. With respect to a trial court's ruling on discovery matters, we have held that:

A trial court is permitted broad discretion in the control and management of discovery, and it is only for an abuse of discretion amounting to an injustice that we will interfere with the exercise of that discretion. A trial court abuses its discretion when its rulings on discovery motions are clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock our sense of justice and to indicate a lack of careful consideration.

Syl. pt. 1, *B.F. Specialty Co. v. Charles M. Sledd Co.*, 197 W.Va. 463, 475 S.E.2d 555 (1996).

### ██ 1. Limitation of geographic area.

The trial court ruled that Ms. Doe could only discover information of similar criminal assaults at Wal–Mart stores "within a geographic area encompassing parts of South Eastern Ohio, Southern Western Virginia, South Western Virginia and Eastern Kentucky."[12] Wal–Mart argues that the trial court limited the geographic area because a nationwide report would be unduly burdensome, and because geographic and cultural differences, and frequency and predictability of the commission of crime, differs substantially between various areas of the country. As a result, Wal–Mart suggests that information regarding the commission of crimes at other Wal–Marts across the country would not be helpful to the trier of fact charged with considering similar criminal assaults in Beckley, West Virginia.

Our cases have held that

[u]nder Rule 26(b)(1)(iii) of the West Virginia Rules of Civil Procedure, a trial court may limit discovery if it finds that the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Syl. pt. 2, *State Farm Mut. Auto. Ins. Co. v. Stephens*, 188 W.Va. 622, 425 S.E.2d 577 (1992). *See generally State ex rel. Allstate Ins. Co. v. Gaughan*, 203 W.Va. 358, 508 S.E.2d 75 (1998). Because Wal–Mart is a national chain and because of the differing crime rates throughout the nation, we agree that the trial court did not abuse its discretion by limiting Ms. Doe's geographic area of discovery.

### ██ 2. Limiting meaning of similar incidents.

Ms. Doe also asserts that the trial court impermissibly limited the definition of "similar incidents" of criminal assaults at Wal–Mart stores to mean "the incident had to be reported to Wal–Mart within three days and it had to involve a person who had just been or was patronizing a Wal–Mart store." Based upon this limitation, Wal–Mart responded that no similar incident occurred at stores within the geographic limitations imposed by the trial court.

While we believe the trial court was correct in limiting similar incidents to mean crimes committed on persons that were patronizing Wal–Mart stores, we are unable to find a rational basis for the three day reporting limitation. Therefore, on remand, the trial court must permit Ms. Doe to discover information from Wal–Mart regarding crimi-

---

"[o]nce a trial judge rules on a motion in limine, that ruling becomes the law of the case unless modified by a subsequent ruling of the court." *See also* Syl. pt. 4, *Honaker v. Mahon*, 210 W.Va. 53, 552 S.E.2d 788 (2001).

12. The parties reference the trial court's memorandum order on this issue. Ms. Doe's brief refers to an order dated August 17, 1998. The record contains an order dated August 17, 1998, however, that order is for a different case and was apparently placed in this record by mistake. Wal–Mart suggests the date for the order is August 7, 1998. Unfortunately, there is no August 7, 1998, order contained in the record presently before this Court.

nal assaults on patrons at Wal–Mart stores, within the previously discussed limited geographic area, regardless of when such incidents were reported.

### E. Exclusion of Expert Testimony

Ms. Doe further assigns error to the trial court's exclusion of certain expert testimony. This Court has held that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. pt. 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991).

### 1. Testimony regarding other crimes.

Ms. Doe's expert, Dr. George Kirkman, relied upon thirty-eight incidents of crimes at other shopping center parking lots in areas around the Beckley Crossings Shopping Center to formulate his opinion that Wal–Mart was on notice for the need to provide security at its parking lot. However, prior to trial, the court limited Dr. Kirkman's testimony and excluded crimes that were not the same type of crimes committed against Ms. Doe.

Upon this Court's examination of the various crimes committed at shopping centers in the area of the Beckley Crossings Shopping Center, we are not persuaded that the trial court properly excluded such evidence. Those crimes involved robbery, sexual assault, purse snatching, vehicle break-in, assault and battery, and auto theft. We noted in Syllabus point 2 of *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994), that:

> Rule 703 of the West Virginia Rules of Evidence allows an expert to base his opinion on (1) personal observations; (2) facts or data, admissible in evidence, and presented to the expert at or before trial; and (3) information otherwise inadmissible in evidence, if this type of information is reasonably relied upon by experts in the witness' field.

Wal–Mart does not contend that the thirty-eight crimes in question are not of the type relied upon by security consultants like Dr. Kirkman. Instead, Wal–Mart argues that the "probative value [of such evidence] is substantially outweighed by the danger of prejudice it creates[.]" We disagree. While this evidence may be prejudicial to Wal–Mart, such prejudice does not outweigh its probative value in allowing the jury to fairly assess the validity of Dr. Kirkman's expert opinion. We therefore conclude that the trial court should have permitted Dr. Kirkman to testify regarding the thirty-eight crimes in areas around the Beckley Crossing Shopping Center that helped to formulate his opinion.[13]

### 2. Testimony concerning expert's prior experience with Wal–Mart.

During the trial of this case, Ms. Doe sought to introduce Dr. Kirkman's testimony regarding his involvement in nine other lawsuits against Wal–Mart in other parts of the country. Such evidence was introduced to show "that Wal–Mart's experience as a company was relevant to its duty to provide security in this case." The trial court precluded such testimony. Here, Wal–Mart contends that the probative value of the evidence relating to the parking lot crimes in nine other lawsuits was substantially outweighed by its prejudicial impact. Therefore, the trial court was correct in excluding such testimony.

> Because the trial court found that Dr. Kirkman could testify about some of these disputed crimes, we have assumed that all of the crimes discussed in this section were not subject to challenge as inadmissible facts relied upon by Dr. Kirkman in forming his expert opinion. To the extent that our assumption is incorrect, the determination of the admissibility of all crimes relied upon by Dr. Kirkman should be governed by the principles set fourth in Section III, E. 2, *infra*.

**13.** Additionally, Dr. Kirkman was precluded from testifying about twenty-eight other crimes committed within a two mile radius of Beckley Crossings Shopping Center. Following our review of these crimes, we are concerned that some of these occurrences do not appear to have occurred at commercial enterprise parking lots and that still others involved drug trafficking. On remand, the trial court should permit testimony by Dr. Kirkman concerning these additional twenty-eight crimes to the extent that they occurred in parking areas of commercial enterprises and did not involve the sale of illegal drugs.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Under Rule 703, an expert may base an opinion on inadmissible evidence.  Assuming, without deciding, that testimony pertaining to the nine lawsuits is generally inadmissible, the question remains as to whether Dr. Kirkman may nevertheless be allowed to present such testimony to the jury.[14]  A leading commentator considering this query has suggested:

> [a]n expert often should be allowed to disclose to the jury the basis for an opinion because otherwise the opinion is left unsupported with little way for evaluation of its correctness.  In those situations, the expert may testify to evidence even though it is inadmissible under the hearsay rule, but allowing the evidence to be received for this purpose does not mean it is admitted for its truth.  It is received only for the limited purpose of informing the jury of the basis of the expert's opinion and therefore does not constitute a true hearsay exception.

John W. Strong, *McCormick on Evidence* § 324, at 356 (5th ed. 1999).

In a similar manner, federal courts have resolved the issue of admitting an expert's inadmissible underlying facts by amending Rule 703 of the Federal Rules of Evidence in April of 2000.  Amended Federal Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.  *Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.*

(Emphasis added).  Under Federal Rule 703, the trial court must undertake a balancing test to determine whether to allow an expert to testify to inadmissible facts that helped formed the basis of his or her opinion.  *See Katt v. City of New York*, 151 F.Supp.2d 313, 356 n. 36 (S.D.N.Y.2001) ("The 2000 Amendments to Rule 703 limit this long-standing rule (excluding hearsay), by allowing such reliance on hearsay only when 'the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.' ").

■ In light of the above authorities, we hold that an expert witness may testify about facts he/she reasonably relied upon to form his/her opinion even though such facts would otherwise be inadmissible as hearsay if the trial court determines that the probative value of allowing such testimony to aid the jury's evaluation of the expert's opinion substantially outweighs its prejudicial effect.  If a trial court admits such testimony, the jury should be instructed that the otherwise inadmissible factual evidence is not being admitted to establish the truth thereof but solely

---

14.  Rule 705 of the West Virginia Rules of Evidence permits the trial court to require disclosure of the underlying facts that helped formed an expert's opinion and provides:

> The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

for the limited purpose of informing the jury of the basis for the expert's opinion.

■ During the proceedings underlying the case *sub judice,* Dr. Kirkman was prepared to testify specifically about nine other cases against Wal–Mart. The testimony was being offered as part of the basis for his opinion as to Wal–Mart's awareness of the potential for parking lot crimes and the need for adequate security. In view of the admissibility test announced herein, we reverse the trial court's exclusion of this testimony. On remand, should Ms. Doe again seek to have Dr. Kirkman testify regarding the nine previous lawsuits, the trial court must utilize the test formulated this opinion to determine whether such testimony is admissible.

### F. Exclusion of the David Gorman Article

■ Ms. Doe similarly complains of the trial court's exclusion of an article written by David Gorman, Wal–Mart's Vice President of Loss Prevention. In Syllabus point 9, in part, of *Tudor v. Charleston Area Medical Center, Inc.,* 203 W.Va. 111, 506 S.E.2d 554 (1997), we set forth our standard of review regarding a circuit court's decision to admit or exclude evidence:

> The West Virginia Rules of Evidence ... allocate significant discretion to the trial court in making evidentiary ... rulings. Thus, rulings on the admission of evidence ... are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary ... rulings of the circuit court under an abuse of discretion standard.

Mr. Gorman's article, published in 1996 in Security Management Magazine, indicated that, according to a 1994 survey, 80% of all Wal–Mart crimes occurred in its parking lots. The article reported that a "trial use" of roving golf cart patrols in parking lots at

certain Wal–Mart stores in Florida reduced crime in those parking lots.[15] Moreover, the article indicated that Wal–Mart had used these vehicles in 250 stores.

On appeal, Wal–Mart asserts that the evidence was properly excluded under Rule 407 of the West Virginia Rules of Evidence as evidence of subsequent remedial measures.[16] By contrast, Ms. Doe argues that, at trial Wal–Mart contended that the crime in this case could not have been prevented. Therefore, Ms. Doe suggests that Mr. Gorman's article was admissible to contradict Wal–Mart's claim by showing the reduction of crime at its stores through the use of roving golf cart patrols. In essence, Ms. Doe asserts that the article was admissible for impeachment purposes.

Wal–Mart further intimates that it did not present evidence regarding the feasibility of using roving golf cart patrols at the Beckley Crossings Shopping Center. Therefore, Rule 407's feasibility exception was not triggered. The problem with Wal–Mart's contention in this respect is that under Rule 407, feasibility is only one of a few examples of how evidence of subsequent remedial measures may be admitted into evidence. Professor Franklin D. Cleckley has demonstrated that another exception to Rule 407 is impeachment. *See* Franklin D. Cleckley, 1 *Handbook on Evidence for West Virginia Lawyers* § 4–7(D) (1994). *See also Muzyka v. Remington Arms Co., Inc.,* 774 F.2d 1309, 1313 (5th Cir.1985) ("But we are persuaded that in light of the posture of the defense, and the manner in which the evidence unfolded, especially in light of defense counsel's opening statement and closing argument, evidence of the design-change should have been permitted for purposes of impeachment. That allowance would have been consistent with both the letter and spirit of Fed.R.Evid. 407."); *Demos v. Ferris–Shell Oil Co.,* 317 Ill.App.3d 41, 251 Ill.Dec. 179, 740 N.E.2d 9, 18–19 (2000) ("Subsequent re-

---

**15.** The trial use of roving golf cart patrols was begun *after* the crime in the instant proceeding.

**16.** Rule 407 of the West Virginia Rules of Evidence provide as follows:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to

prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

medial measures may be admitted into evidence to show ownership or control where disputed by the defendant, to prove feasibility of precautionary measures where disputed by the defendant and for impeachment purposes."); *Ellsworth v. Hotel Corp. of America*, 236 Mich.App. 185, 600 N.W.2d 129, 132 (1999) ("It is well established that evidence of a subsequent remedial measure is admissible as impeachment when the opposing party has denied making a repair".); *Ielouch v. The Missouri Highway & Transp. Comm'n.*, 972 S.W.2d 563, 566 (Mo.Ct.App.1998) ("[A]lthough evidence of subsequent remedial measures is inadmissible as proof of antecedent negligence, the evidence may be admissible to prove ownership or control, to establish the feasibility of precautionary measures when the issue is in dispute, and for use for impeachment or rebuttal."); *Duchess v. Langston Corp.*, 564 Pa. 529, 769 A.2d 1131, 1146 (2001) ("As noted, Rule 407's general prohibition is expressly inoperable in relation to remedial measures evidence offered 'for impeachment or to prove other controverted matters, such as ownership, control, or feasibility of precautionary measures.' ").

■ While it is clear that impeachment is an exception to Rule 407, we are mindful that evidence of subsequent remedial measures is not admissible to prove negligence or culpable conduct in connection with the event. "The purpose of the rule is to exclude evidence of a party's subsequent remedial measures so as not to discourage them from taking such safety measures." *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 207 (Tex.Ct.App.2000). Consequently, it is appropriate for trial courts to consider the public policy concern behind Rule 407 in balancing the probative value of this evidence against its potential prejudicial effect. "In this way, the court can prevent the impeachment exception from swallowing the rule." *Cyr v. J.I. Case Co.*, 139 N.H. 193, 652 A.2d 685, 694 (1994). Moreover, "[i]f it appears that a party is seeking the introduction of evidence of subsequent remedial measures to imply culpability under the guise of impeachment or any other purpose, certainly the trial court should disallow the evidence."

*Watson v. Navistar*, 121 Idaho 643, 827 P.2d 656, 677 (1992). Appropriate guidelines in this regard were set out in *Herzog v. Lexington Township*, 167 Ill.2d 288, 212 Ill.Dec. 581, 657 N.E.2d 926, 933 (1995) as follows:

Where the impeachment value rests on inferences other than prior negligence, such evidence may be admitted where its probative value outweighs the prejudice to defendant.... Similarly, where the defendant goes beyond stating that the original condition was safe or adequate, and attempts to make exaggerated claims that the condition was the "safest possible," fairness may require that conduct inconsistent with these claims be admitted. In such a situation, the defendant has gone beyond simply stating that he was not negligent prior to the accident and claimed that no greater care was possible. Any subsequent remedial measure taken by the defendant is directly impeaching of this claim without an inference of prior negligence.

■ Thus, we hold that pursuant to West Virginia Rules of Evidence Rule 407, evidence of subsequent remedial measures may be introduced for purposes of impeachment (1) when inferences other than the defendant's prior negligence may be drawn therefrom or (2) when the defendant introduces evidence to prove that the condition alleged to have caused the plaintiff's injury was as safe as the circumstances would permit, and (3) the probative value of such evidence outweighs its potential prejudicial effect.

In the instant proceeding we find that, under the test announced herein, Dr. Gorman's article was admissible as impeachment evidence, and it was error for the trial court to have excluded it. On remand, should Wal–Mart again defend this case on the basis that the crime which occurred could not have been prevented because no greater care was possible, Ms. Doe may be permitted to impeach such defense through Dr. Gorman's article.[17]

### G. Posttrial Sanctions

■ In *Wal–Mart I*, 198 W.Va. 100, 479 S.E.2d 610, this Court remanded the case to

---

17. In addition to excluding Dr. Gorman's article, Ms. Doe points out that the trial court precluded

another of her experts, Dr. Jack Enter, from testifying about specific issues raised in the arti-

the trial court for posttrial discovery. After the posttrial discovery had been conducted, the trial court concluded that Wal–Mart had concealed information and misrepresented facts during pretrial discovery of Mr. Gorman's study.[18] Ms. Doe now argues that the trial court improperly refused to impose sanctions for the discovery violation. In contrast, Wal–Mart contends that the issue is not properly before this Court because the trial court has not refused to impose sanctions. We agree with Wal–Mart. From, our review of the record, it appears that the trial court has not ruled upon the imposition of posttrial sanctions. Instead, the trial court's order indicates that if sanctions are imposed, they would not be severe because Mr. Gorman's study was not admissible at trial.[19] Since we have determined that Mr. Gorman's study and article were admissible, the trial court may, upon remand, revisit the issue in light of the Court's ruling in this regard. See Syl. pt. 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958) ("This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.").

## IV.

## CONCLUSION

In view of the foregoing, the judgment awarding a verdict for Wal–Mart is reversed.

This case is remanded for a new trial and further proceedings consistent with this opinion.

Reversed and Remanded.

Justice STARCHER, concurs and files concurring opinion.

STARCHER, Justice, concurring:

(Filed Dec. 13, 2001)

I concur with the majority's decision to reverse the judgment below, and to remand this case for a new trial. I write separately to emphasize that when a large corporate defendant such as Wal–Mart, an institution with significant power and financial resources, uses obstructive tactics to make litigation difficult for injured victims and their attorneys, a circuit court must deal with these tactics head-on and use its power to level the playing field.

A quick search of reported cases reveals that Wal–Mart parking lots are a virtual magnet for crime. A host of rapes, robberies and murders have occurred in the past few years which resulted in litigation against Wal–Mart.[1] While the average customer wouldn't reasonably expect that criminals prowl through Wal–Mart parking lots looking

cle. To the extent that we have determined that the article was admissible, it was error for the trial court to preclude such testimony.

18. Mr. Gorman's study and article are separate documents. The study concerned data and other information that was relied upon to prepare the article, and is admissible for the same reasons cited for admissibility of the article.

19. Ms. Doe also argues that the trial court committed error by precluding her from conducting posttrial discovery to determine the type of sanctions other jurisdictions imposed on Wal–Mart. This issue is also not properly before this Court because the trial court ruled that such an inquiry could be made once it was determined that sanctions would in fact be imposed.

1. A search of the reporters revealed the following cases: *Grisham v. Wal–Mart Stores, Inc.*, 929 F.Supp. 1054 (E.D.Ky.1995) (customer shot during armed robbery in Wal–Mart parking lot); *Goins v. Wal–Mart Stores, Inc.*, 1995 WL 638607 (E.D.La.1995) and *Goins v. Wal–Mart Stores, Inc.*, 800 So.2d 783 (La.2001) (plaintiff's daugh-

ter abducted at gunpoint while walking through Wal–Mart parking lot and raped); *Wal–Mart Stores, Inc. v. McDonald*, 676 So.2d 12 (Fla.App. 1996) and *Merrill Crossings, Assoc. v. McDonald*, 705 So.2d 560 (Fla.1997) (plaintiff shot in Wal–Mart parking lot); *C.A. v. Wal–Mart, Inc.*, 683 So.2d 413 (Ala.1996) (plaintiff abducted from Wal–Mart parking lot and raped); *McClung v. Delta Square Limited Partnership*, 937 S.W.2d 891 (Tenn.1996) (customer abducted from Wal–Mart parking lot, raped and murdered); *Willmon v. Wal–Mart Stores, Inc.*, 957 F.Supp. 1074 (E.D.Ark.1997) (customer abducted from Wal–Mart parking lot, raped and murdered); *Benton Investment Co., Inc. v. Wal–Mart Stores, Inc.*, 704 So.2d 130 (Fla.App.1997) (plaintiff shot in Wal–Mart parking lot in attempt to steal her purse); *Wal–Mart Stores, Inc. v. Nicholson*, 1998 WL 224744 (Tex.App.1998) (customer robbed at gunpoint, almost kidnaped, from Wal–Mart parking lot); *Simon v. Wal–Mart Stores, Inc.*, 193 F.3d 848 (5th Cir.1999) (customer's purse snatched from Louisiana Wal–Mart parking lot); *Posecai v. Wal–Mart Stores, Inc.*, 752 So.2d 762 (La.1999) (customer robbed at gunpoint in parking lot of

for victims, these lawsuits prove that Wal–Mart has absolute knowledge of the criminal activity routinely occurring on its doorstep.

But even with the knowledge that its parking lots are crime magnets, Wal–Mart did nothing to prevent crimes against its customers—customers such as the plaintiff in this case. While Wal–Mart was putting cameras and security guards inside its stores to prevent theft, Wal–Mart's Vice President of Loss Prevention, Dave Gorman, indicated in 1996 that only 276 of Wal–Mart's 2,500 stores had outside security patrols and only 400 had outside cameras. *See* "An Interview with Wal–Mart's Dave Gorman on the Chain's New Parking Security Program," 7 Parking Security Rep. 10 (June 1996) (*quoted in* Gilbert Adams, III, *et al.*, "Big Box Retailers: Discovery Abuse," 36 Trial 39, 40 n. 11 (April 2000)).

In the instant case, the record suggests that Wal–Mart improperly narrowed—with the circuit court's support—the plaintiff's right of discovery about crimes at Wal–Mart stores to mean "the incident had to be reported to Wal–Mart within three days and it had to involve a person who had just been or was patronizing a Wal–Mart store." The circuit court also geographically limited the plaintiff's discovery to the area surrounding southern West Virginia.[2]

In addition to the circuit court limiting Wal–Mart's responses to the plaintiff's discovery requests, Wal–Mart appears to have just out-and-out hidden evidence from the plaintiff. A standard technique for Wal–Mart is to suggest to trial courts that the plaintiff's cause of action is unique—even though Wal–Mart's legal department may have handled dozens, hundreds, or even thousands of identical cases. And then Wal–Mart "accidentally" fails to produce important documents which pertain to the plaintiff's lawsuit—even though it may have already produced those documents in another lawsuit, and even if the plaintiff specifically asks for the documents.[3]

For example, the average consumer probably thinks being hit and injured by merchandise falling from shelves at Wal–Mart is an uncommon occurrence—yet it actually happens thousands of times each year. In several cases, Wal–Mart has been compelled—

Sam's Wholesale Club, a Wal–Mart subsidiary); *Valdes v. Wal–Mart Stores, Inc.*, 199 F.3d 290 (5th Cir.2000) (plaintiff abducted at knifepoint from Wal–Mart parking lot and raped); *Miletic v. Wal–Mart Stores, Inc.*, 339 S.C. 327, 529 S.E.2d 68 (2000) (customer abducted at gunpoint from Wal–Mart parking lot and robbed); and *Wal–Mart Stores, Inc. v. Dickinson*, 29 S.W.3d 796 (Ky.2000) (plaintiff suffered injuries during purse snatching in Wal–Mart parking lot).

2. The circuit court ruled that the plaintiff could only discover information "within a geographic area encompassing parts of ... Eastern Kentucky." Wal–Mart responded to the plaintiff's discovery requests by stating that no similar criminal assaults had occurred at stores within this geographic area.

However, research reveals a similar criminal assault within this geographic area. In *Grisham v. Wal–Mart Stores, Inc.*, 929 F.Supp. 1054 (E.D.Ky.1995), the plaintiff was robbed at gunpoint in a Wal–Mart parking lot in Florence, Kentucky, and was shot when she pushed the gun away. It does not appear that information regarding this aggravated robbery was provided to the plaintiff in the instant case.

3. A classic example of this type of discovery abuse by Wal–Mart can be found in a recent case from Ohio. The decedent was an employee of Wal–Mart. While the decedent was operating a forklift, the truck he was unloading prematurely pulled away from the loading dock. The forklift fell from the truck and the employee was killed. The plaintiff, the decedent's wife, sued Wal–Mart and was awarded $2 million in damages. *See Davis v. Sam's Club*, 77 Ohio St.3d 1526, 674 N.E.2d 377 (1997).

During the lawsuit, the plaintiff learned Wal–Mart had withheld documents. A private investigator hired by the plaintiff discovered a 1992 memorandum discussing premature pull-away incidents at loading docks. When the plaintiff specifically requested that Wal–Mart produce information relating to loading dock injury claims, neither the 1992 memorandum nor any other documents were produced. The plaintiff's copy of the 1992 memorandum was used at trial.

A week after Wal–Mart paid the judgment, the plaintiff filed a second lawsuit alleging that Wal–Mart's spoliation of evidence had led her to dismiss certain causes of action, preventing her from recovering additional compensatory and punitive damages. Discovery revealed new documents regarding employee loading dock injury claims recorded in memoranda that were not disclosed by Wal–Mart in the first trial.

The Supreme Court of Ohio concluded that the spoliation claims were separate from the underlying tort action, and that the plaintiff could proceed with her spoliation action.

usually after extensive litigation—to produce a list showing more than 18,000 falling merchandise incidents over five years. *See, e.g., Shafer v. Wal–Mart Stores, Inc.,* 176 F.3d 484 (9th Cir.1999).[4]

In the instant case, Wal–Mart appears to have concealed from the plaintiffs information regarding Mr. Gorman's study of crime in Wal–Mart parking lots. *See* David H. Gorman, "Loss Prevention Racks Up Success," *Security Management* (Mar. 1996) (at page 55) (also available at *www.securityman-agement.com/library/000098.html*). Mr. Gorman discovered that "80 percent of crimes at Wal–Mart were occurring not in the stores, but outside their walls, either in the parking lots or around the exterior perimeter of the stores." The crimes ranged from "theft, break-in and vandalism of cars" to "purse snatches, muggings, and assaults."

To combat crime, Wal–Mart introduced a roving golf cart security patrol at one store in Tampa, Florida. At that facility, during 1994 there were 226 cars stolen, 25 purse snatches, 32 burglaries, 14 armed robberies, 3 assaults, and 1 arson. When the roving patrol began, "[d]uring the first four months ... the reported incidents for each of these crimes dropped to zero, and numbers have remained low. Other stores have seen similar declines."

The total cost to Wal–Mart: "up to $45,000 per year per store, including vehicle leasing and drivers' salaries."

The total cost to Wal–Mart to virtually eliminate crime from its parking lots is, at most, by its own reckoning, $45,000—the loss of the plaintiff in the instant case is immeasurable. I believe the obvious disparity a jury would see between these two sums would provide a significant incentive for Wal–Mart to hide Mr. Gorman's report, and his raw data and other suppositions, from the plaintiffs.

Upon remand, the circuit court should eliminate this incentive to engage in discovery abuse like hiding documents, so that Wal–Mart clearly understands that West Vir-

ginia courts will not tolerate such misconduct. Circuit courts must make discovery abuse a more expensive alternative than honest disclosures.

Our law requires businesses to keep their premises reasonably safe; our law also requires litigants to participate openly and fairly in the discovery process. When Wal–Mart has failed to participate openly and fairly in discovery, courts have routinely imposed massive penalties, ranging from monetary sanctions and attorneys' fees to jury instructions allowing juries to draw negative inferences from Wal–Mart's conduct. Some courts have even gone so far as to strike Wal–Mart's answer and defenses. As one court recently stated:

> Wal–Mart has drawn sanctions for its pretrial conduct in several other cases. In *Meissner v. Wal–Mart Stores, Inc.,* A–159, 432 (Tex.Dist.Ct. Jefferson Co. Apr. 1999), the court fined Wal–Mart $18 million and entered default judgment in favor of the plaintiff on liability because Wal–Mart withheld evidence. In *Woska v. Wal–Mart Stores, Inc.,* No. 95–3998 (Fl.Cir.Ct. Orange Co. Jan 1998), a Florida court sanctioned Wal–Mart $7,000 for repeated discovery violations. In the case of *Wal–Mart Stores, Inc. v. Davis,* 979 S.W.2d 30 (Tex.App.1998), a Texas court affirmed the imposition of a $120,000 sanction against Wal–Mart for repeated discovery abuses. A Nebraska trial court fined Wal–Mart $5,000 and struck its answer for Wal–Mart's refusal to produce discovery. *Greenwalt v. Wal–Mart Stores, Inc.,* 253 Neb. 32, 567 N.W.2d 560 (1997) (affirming the sanctions). Wal–Mart was fined $15,000 when a Nevada federal court found that it had destroyed photographs of an accident scene. *Shafer v. Wal–Mart Stores, Inc.,* No. 96–650 (D.Nev. June 1996). Another Texas district court fined Wal–Mart $5,000 for its repeated failure to obey discovery orders in *Lynch v. Wal–Mart Stores, Inc.,* (Tex.Dist.Ct. Gregg Co. Aug. 1996). One court noted that "Wal–Mart has chosen extreme discovery abuse

---

4. In fact, there are entire Internet sites dedicated to litigation involving customers hit by falling merchandise at Wal–Mart and other stores. *See,* *e.g., www.fallingmerchandise.com* and *www.wal-martsurvivor.com.*

as a litigation strategy" and fined Wal–Mart $104,120 plus $1,000 for every day that Wal–Mart failed to comply. *New v. Wal–Mart Stores, Inc.*, 96–8–10571 (Tex. Dist.Ct. Jackson Co.). It seems Wal–Mart has yet to learn a lesson from the repeated imposition of sanctions.

*Empire, Inc. v. Wal–Mart Stores, Inc.*, 188 F.R.D. 478, 481–82 (E.D.Ky.1999).[5]

"Unfortunately, nefarious conduct is all too common in lawsuits in which Wal–Mart is a party." *Wilson v. Wal–Mart Stores, Inc.*, 199 F.R.D. 207 (S.D.Tex.2001). The circuit court in the instant case should not hesitate to follow in the footsteps of these other courts when weighing Wal–Mart's misconduct. The circuit court, when it reconsiders the instant case, must not allow Wal–Mart to benefit from its "nefarious conduct," its abuse of the discovery process in our courts.

I therefore respectfully concur.

---

5. Other courts imposing sanctions on Wal–Mart for misconduct during discovery include *Testa v. Wal–Mart Stores, Inc.*, 144 F.3d 173 (1st Cir. 1998) (truck driver was injured slipping on icy ramp while making delivery of tropical fish; court instructed jury it could draw a negative inference from the fact that Wal–Mart destroyed documents allegedly stating it placed the delivery on hold, and did not expect deliveries that day); *Stevenett v. Wal–Mart Stores, Inc.*, 977 P.2d 508 (Utah App.1999) (plaintiff tripped and fell in Wal–Mart parking lot; trial court used proper sanction for discovery abuse by excluding testimony of Wal–Mart's medical expert because Wal–Mart failed to provide expert's report to plaintiff); *GTFM, Inc. v. Wal–Mart Stores, Inc.*, 2000 WL 335558 (S.D.N.Y.2000) (Wal–Mart required to pay plaintiff's attorney fees unnecessarily expended due to Wal–Mart's failure to make an accurate disclosure of its computerized record keeping); *Osterhoudt v. Wal–Mart Stores, Inc.*, 273 A.D.2d 673, 709 N.Y.S.2d 685 (2000) (plaintiff slipped and fell on a "spilled substance" in Wal–Mart; plaintiff sought discovery of documents, but Wal–Mart responded it had none.

Two years later, manager of store appeared at trial with copies of documents the plaintiff had earlier requested. Appellate court held that, as a sanction, Wal–Mart's answer should have stricken and liability resolved in favor of plaintiff); *Wilson v. Wal–Mart Stores, Inc.*, 199 F.R.D. 207 (S.D.Tex.2001) (child burned while wearing garment purchased at Wal–Mart; "Wal–Mart's approach to discovery throughout this case has been, at best, grossly inappropriate." As a sanction, trial court deemed Wal–Mart to be manufacturer of garment; determined it would instruct jury that it could infer bad faith from Wal–Mart's "repeated and protracted concealment of relevant documents and witnesses;" struck several witnesses; and ordered Wal–Mart to pay $1,000.00 in attorney's fees to plaintiff); *Wal–Mart Stores, Inc. v. Johnson*, 39 S.W.3d 729 (Tex. App.2001) (reindeer Christmas decorations fell on plaintiff from a high shelf in Wal–Mart, and Wal–Mart failed to preserve reindeer as evidence; trial court properly gave a spoliation instruction to the jury, allowing jury to draw an inference that the "reindeer, if produced, would be unfavorable to Wal–Mart.").